1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  JEFFREY A. BACKHUS (CABN 200177)
   Assistant United States Attorney
5
       60 South Market Street, Suite 1200
6      San Jose, California 95113
       Telephone: (408) 535-5080
7      FAX: (408) 535-5066
       jeffrey.backhus@usdoj.gov
8
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 25-00438-PCP |
| Plaintiff, | MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR DETENTION |
| v. | Date: December 23, 2025 |
| VICTOR DANIEL WALLANDER TORRES, | Time: 11:00 a.m. |
| Defendant. | Judge: Hon. Alex G. Tse |

The United States moves for detention of defendant Victor Daniel Wallander TORRES ("TORRES") as both a danger to the community and a serious risk of non-appearance under 18 U.S.C. § 3142(f)(1)(C) and (f)(1)(E).

On December 18, 2025, a federal grand jury returned a seven-count Indictment against TORRES and his co-defendant Ivan Alejandro HERNANDEZ-DIAZ (hereinafter "HERNANDEZ-DIAZ"). TORRES is only charged in Count Six, with distribution of a possession with the intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). This charge arises from conduct occurring during a controlled buy on November 19, 2025, during which Torres sold approximately 435.4 grams of actual methamphetamine to a confidential source.

UNITED STATES' DETENTION MEMORANDUM
CR 25-00438-PCP                                   1

Because this case involves an offense under the Controlled Substances Act with a maximum term of imprisonment of ten years or more, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance. 18 U.S.C. § 3142(e)(3)(A).

The presumption is fully supported by the facts:

- TORRES distributed approximately 435.4 grams of actual methamphetamine to a confidential source (referred to in the original complaint as CS-2) who was working for the Drug Enforcement Administration.
- During the drug transaction on November 19, 2025, TORRES described his sophisticated drug smuggling and trafficking business and experience smuggling drugs across the U.S./Mexico border;
- Also during the November 19, 2025 transaction, HERNANDEZ-DIAZ described TORRES as his drug source of supply who provided the drugs that HERNANDEZ-DIAZ previously sold to confidential informants and an undercover law enforcement officer("UC");
- A search warrant at TORRES' residence yielded an additional 100 gross grams of suspected counterfeit M-30 pills and a quantity of cocaine;
- TORRES is now a naturalized U.S. citizen, but has extensive family and business ties to Mexico and, according statements he made to CS-2, he has experience smuggling items over the border – experience he could use if he wanted to flee;
- He faces a mandatory minimum ten-year federal sentence, creating a powerful incentive to flee.

For the reasons below, the government submits that no condition or combination of conditions can reasonably assure TORRES' appearance or the safety of the community.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

   A.   **Background**

The DEA has been investigating the drug and firearm trafficking activities of HERNANDEZ-DIAZ in the Northern District of California since May of 2025. This investigation resulted in several controlled purchases from HERNANDEZ-DIAZ. Specifically, On June 18, 2025, HERNANDEZ-DIAZ sold approximately 49 grams of counterfeit M30 pills containing fentanyl to a confidential source

(referred to in the original Complaint as "CS-1"). On July 24, 2025, HERNANDEZ-DIAZ sold approximately 149.7 grams of counterfeit M30 pills containing fentanyl, 6 grams of methamphetamine and a shotgun to another confidential source, referred to as CS-2. On August 22, 2025, HERNANDEZ-DIAZ sold approximately 484.9 grams of actual methamphetamine and a handgun to the UC. On September 17, 2025, HERNANDEZ-DIAZ sold a shotgun to the UC. On October 1, 2025, HERNANDEZ-DIAZ sold approximately 12.1 grams of counterfeit M30 pills containing fentanyl and an AR-15 style rifle to CS-2. One of the purposes of these transactions was to identify HERNANDEZ-DIAZ's drug source of supply – who was later identified as TORRES. These transactions also let to the November 19, 2025 transaction described below.

**B.     November 19, 2025 – Methamphetamine Transaction with TORRES and HERNANDEZ-DIAZ.**

On or about November 17, 2025, HERNANDEZ-DIAZ contacted CS-2 via telephone and stated that he (HERNANDEZ-DIAZ) had multiple pounds of methamphetamine available for sale. HERNANDEZ-DIAZ stated each pound was currently cheap due to the surplus availability of drugs. HERNANDEZ-DIAZ stated each pound was selling for $850 pounds and asked if CS-2 was interested. CS-2 stated they were interested, and they would get back to HERNANDEZ-DIAZ. HERNANDEZ-DIAZ also stated this would be a good opportunity to meet his source, whom he referred to as "Danny," so there could be more trust for any larger transactions. CS-2 subsequently agreed to purchase a pound of methamphetamine for $850 from HERNANDEZ-DIAZ and "Danny" on November 19, 2025. HERNANDEZ-DIAZ stated he would bring "Danny" along to the transaction since he was the one supplying the methamphetamine.

On November 19, 2025, CS-2 was in contact with HERNANDEZ-DIAZ regarding doing the one pound of methamphetamine transaction for $850. At approximately 3:30 p.m., utilizing a public camera, law enforcement observed a white Chevrolet single cabin pickup truck arrive at HERNANDEZ-DIAZ's residence in in Seaside, CA. HERNANDEZ-DIAZ exited the residence and entered through the front passenger side of the truck. The truck departed shortly after. During this time, HERNANDEZ-DIAZ contacted CS-2 and stated that he was waiting to get picked up to go do the drug transaction with CS-2, and HERNANDEZ-DIAZ said he was on his way. Over the next two hours, HERNANDEZ-

1  DIAZ remained in contact with CS-2 and provided CS-2 with updates on HERNANDEZ-DIAZ's
2  estimated arrival.
3      At approximately 5:19 p.m., law enforcement observed a gray Ford Mustang[1] pulling up to the
4  previously agreed-upon meeting location in Freedom, CA.  The Mustang parked next to CS-2's vehicle.
5  HERNANDEZ-DIAZ exited through the passenger side and an individual, identified as TORRES"),
6  exited through the driver side of the Mustang.  HERNANDEZ-DIAZ entered CS-2's vehicle through the
7  rear driver side and TORRES entered through the front passenger side.  While inside, HERNANDEZ-
8  DIAZ introduced TORRES as "Daniel."  TORRES had a small black backpack and took out a clear bag
9  containing another sealed bag with a white crystal substance.  TORRES placed the clear bag with the
10 crystal substance on the center console and CS-2 inspected it for a while, complimented it, and handed it
11 to HERNANDEZ-DIAZ in the backseat and told him to place the clear bag inside CS-2's gym bag next
12 to him.  CS-2 counted the money and paid $850 to TORRES.
13     Following the transaction, TORRES, HERNANDEZ-DIAZ and CS-2 continued to discuss
14 TORRES's methamphetamine trafficking operation.  TORRES showed CS-2 videos of how the
15 methamphetamine was packaged in a vacuum sealed bag.  CS-2 stated they were looking to get up to
16 120 pounds of methamphetamine and they were looking for a good source.  CS-2 then asked about
17 getting M30 pills, and HERNANDEZ-DIAZ responded by saying TORRES was also sourcing those
18 drugs.  TORRES showed CS-2 additional videos related to narcotics on TORRES's phone and explained
19 logistics regarding pricing and amounts of narcotics being ordered.  TORRES said they have multiple
20 drug couriers, and the last courier was pulled over by law enforcement and 80 pounds of
21 methamphetamine was seized.  TORRES explained the narcotics come from Tijuana, Mexico.
22 TORRES said he typically goes south to meet with the source to partially pay for the narcotics.[2]
23 TORRES stated they have used an "uber" (slang term used for "courier") who would physically
24 transport the narcotics while TORRES followed behind in a different vehicle.  TORRES mentioned that
25 public cameras pick up vehicle plates, especially Mexican plates, which get flagged and notify law
26

---

27      [1] The gray Ford Mustang is registered to two individuals, including Victor Wallander Torres.
28      [2] Border crossing records show TORRES' grey Mustang crossing into and out of Tijuana, Mexico through the San Ysidro Point of Entry on August 31, 2025.

UNITED STATES' DETENTION MEMORANDUM
CR 25-00438-PCP                                          4

enforcement. TORRES explained they would rather use cars with American plates to draw less attention. TORRES stated he typically travels to San Diego to pick up narcotics, but he has the narcotics transported in a different vehicle. CS-2 asked about "buttones" (buttons – slang for M30 pills) and TORRES said he has access to those as well and said they look like prescribed M30 pills. TORRES continued to explain he can get white M30 pills as well but those are typically more expensive since they look real. TORRES said he sells 1,000 M30s for $1,000 and charges $850 per pound of methamphetamine. A few minutes later, TORRES explained he could get methamphetamine at a cheaper price if it came in liquid form and TORRES could convert the methamphetamine in a conversation lab if he had access to a ranch to work on. TORRES and HERNANDEZ-DIAZ then exited CS-2's vehicle and TORRES entered the Mustang through the driver side and HERNANDEZ-DIAZ entered through the passenger side and departed the location.

CS-2 met with law enforcement after the drug transaction who took custody of the drugs. The drugs were later sent to the Western Laboratory for analysis. The results from the lab show the suspected methamphetamine was identified as Methamphetamine Hydrochloride with a net weight of 444.3 g +/- .002 g with a substance purity of 98% +/- 7% and amount pure substance of 435.4 +/- .29.1 g.

### C. Search Warrant at TORRES' Residence.

On December 18, 2025, law enforcement executed a search warrant at TORRES' residence in Marina, CA. At the property, officers found approximately 100 gross grams of counterfeit M-30 pills that often contain fentanyl and approximately 160 grams of cocaine.

## II. LEGAL ARGUMENT

### A. TORRES faces a rebuttable presumption in favor of detention.

Under the Bail Reform Act, a defendant may be detained if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government must show danger by clear and convincing evidence, and risk of flight by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).

Where, as here, there is probable cause to believe that the defendant committed a Controlled Substances Act offense with a maximum term of imprisonment of ten years or more, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. 18 U.S.C. § 3142(e)(3)(A). The presumption shifts the burden of production to the defendant, though the burden of persuasion remains with the government.

TORRES cannot meaningfully rebut this presumption, and the § 3142(g) factors favor detention.

### B. Danger to the Community

The nature and circumstances of the offense strongly support a finding of danger under § 3142(g)(1). TORRES was not a casual user or low-level street dealer; rather, the evidence shows that he was engaged in large-scale, organized drug trafficking involving multi-kilogram quantities of methamphetamine. He has admitted to regularly travelling to Tijuana to obtain methamphetamine from and transporting it back toward the Bay Area for resale. A subsequent search of his residence revealed additional drugs. TORRES further admitted that he has a sophisticated drug trafficking organization and has access to large quantities of methamphetamine. According to TORRES, one of his couriers was recently stopped by law enforcement and 80 pounds of methamphetamine was seized. High-volume narcotics trafficking of this nature, standing alone, poses a grave danger to the community.

Although the defense may propose location monitoring, a curfew, or a bond, such conditions cannot reasonably mitigate the danger. GPS monitoring cannot prevent TORRES from continuing to direct drug trafficking from his residence. Considering the scale of the drug activity, the government believes that he poses an unmitigable danger to the community.

### C. TORRES cannot overcome the presumption that he is a flight risk.

TORRES faces a ten-year mandatory minimum sentence and a very high guidelines exposure. He is charged with two counts under 21 U.S.C. § 841(b)(1)(A)(viii) for selling approximately 435.4 grams of methamphetamine to CS-2 and claims to be responsible for smuggling even more significant amounts of methamphetamine from Mexico into the Bay Area. Accordingly, TORRES is facing a 10-year mandatory minimum sentence. This significant mandatory minimum, coupled with a likely high guidelines range, creates a powerful incentive for TORRES to flee rather than face the certainty of a lengthy federal sentence.

TORRES's also has strong family and drug trafficking ties to Mexico further heighten the risk of flight. The government is informed that TORRES maintains a substantial family network in Mexico (he was born in Mexico before emigrating to the United States), and he remains in contact with them. TORRES also claims to have significant business ties to Mexico and has stated that he regularly travels back and forth between Mexico and the United States to smuggle illegal narcotics. TORRES has the connections and resources (considering the value of the narcotics he smuggles) to flee should he choose to do so.

Considering the presumption of detention, TORRES's his ties abroad and the severity of his pending criminal exposure, the government has established by a preponderance of the evidence that no condition or combination of conditions can reasonably assure his appearance as required under § 3142(g).

### III. CONCLUSION

The government has shown, and the presumption reinforces, that no condition or combination of conditions can reasonably assure his appearance or the safety of the community. The United States respectfully requests that the Court detain TORRES pending trial under 18 U.S.C. § 3142(e) and (f).

DATED: December 22, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/ Jeffrey A. Backhus
JEFFREY A. BACKHUS
Assistant United States Attorney